FILED
2022 Mar-23  AM 09:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | |
|---|---|
| **TIMOTHY PLIER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 4:20-cv-01627-AMM** |
| | ) |
| **SOCIAL SECURITY** | ) |
| **ADMINISTRATION,** | ) |
| **Commissioner,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OF DECISION

Plaintiff Timothy Plier brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.      Introduction

On February 11, 2016, Mr. Plier protectively filed an application for benefits under Title II of the Act, alleging disability as of January 20, 2016. R. 102–03, 122, 284–85. Mr. Plier alleges disability due to high blood pressure, beginning stages of COPD, tremors, anxiety, and venous insufficiency peripheral disease. R. 102–03.

1

He has a limited education, is able to communicate in English, and has past relevant work experience as a mixing machine operator. R. 31–32.

The Social Security Administration ("SSA") initially denied Mr. Plier's application on May 4, 2016. R. 116, 122, 147–52. On May 31, 2016, Mr. Plier filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 122, 155–56. That request was granted. R. 157–59. Mr. Plier received a hearing before ALJ Michael Brownfield on December 1, 2017 and a supplemental hearing on May 11, 2018, after he was assessed by a cardiologist for a consultative examination. R. 66–101, 122. On July 31, 2018, ALJ Brownfield issued a decision, finding that Mr. Plier was not disabled from January 20, 2016 through his date of last insured, March 31, 2018. R. 119–37. Mr. Plier appealed to the Appeals Council, which granted his request for review on May 17, 2019. R. 142–45. On remand from the Appeals Council, ALJ Cynthia W. Brown considered (1) the entire period under review because the date of last insured changed and (2) the opinion of treating source Munish K. Goyal, M.D. R. 16. Mr. Plier received a hearing before ALJ Brown on December 3, 2019. R. 16, 40–65. On February 18, 2020, ALJ Brown issued a decision, finding that Mr. Plier was not disabled from January 20, 2016 through his date of last insured, December 31, 2019. R. 13–34. Mr. Plier was forty-three years old at the time of the ALJ decision. R. 32, 34.

Mr. Plier appealed to the Appeals Council, which denied his request for review on August 14, 2020. R. 1–3. After the Appeals Council denied Mr. Plier's request for review, R. 1–3, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On October 16, 2020, Mr. Plier sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.   The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id*. *Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If

such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id*. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with his residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Mr. Plier last met the insured status requirements of the Act on December 31, 2019. R. 18. Next, the ALJ found that Mr. Plier did not engage in substantial gainful activity from his alleged onset date through his date of last insured. R. 19. The ALJ determined that Mr. Plier had the following severe impairments: venous insufficiency, chronic obstructive pulmonary disorder ("COPD"), hypertension, anxiety, depression, and personality disorder. R. 19. The ALJ found that Mr. Plier's hand tremors were "non-severe" because "[n]either his physical examinations nor the findings during the [consultative physical exam] . . . reflected any limitations from [Mr. Plier's] slight tremor[]" and "[t]here is no evidence the tremors cause more than a minimal effect on the claimant's ability to perform basic activities for a continuous period of 12 months." R. 19. Additionally, the ALJ found that Mr. Plier's history of alcohol abuse was "not a severe impairment" because "there is no evidence that [Mr. Plier] has been instructed to cease consumption of alcohol, has been terminated from any employment due to alcohol consumption, or would be prevented from the performance of a full range of light work." R. 19. The ALJ also determined that "there is no objective medical evidence that [Mr. Plier's] obesity has affected a major weight bearing joint or resulted in functional limitations upon his ability to perform exertional and/or postural activities on a regular and sustained basis." R. 19. Overall, the ALJ determined that Mr. Plier did not have "an impairment or combination of

impairments that met or medically equaled the severity of one of the listed impairments" to support a finding of disability. R. 19.

The ALJ found that Mr. Plier's "statements concerning the intensity, persistence[,] and limiting effects of these impairments are not consistent with the objective medical evidence." R. 24. The ALJ found that Mr. Plier had the "residual functional capacity to perform light work" with certain limitations. R. 22. The ALJ determined that Mr. Plier is limited to occasionally climb ramps and stairs. R. 22. The ALJ determined that Mr. Plier must: not climb ladders, ropes, or scaffolds; avoid concentrated exposure to extreme cold, heat, fumes, odors, dusts, and other pulmonary irritants; and avoid any exposure to hazards. R. 22. Further, the ALJ noted that Mr. Plier can understand, remember, and carry out short, simple instructions and attend to those for two-hour periods; would need a well-spaced work environment; can tolerate occasional interaction with the public, co-workers, and supervisors; and that changes in the work place should be gradual and occur no more than occasionally. R. 22.

According to the ALJ, Mr. Plier was "unable to perform any past relevant work," he was "a younger individual" on the date of last insured, and he has "a limited education," as those terms are defined by the regulations. R. 31–32. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." R. 32. Because Mr. Plier's "ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations," the ALJ enlisted a vocational expert to ascertain whether there were a significant number of jobs in the national economy that Mr. Plier would be capable of performing. R. 32. That expert testified that there are indeed a significant number of such jobs in the national economy, such as an electronics worker, inspector, and hand packager. R. 32–33.

Based on these findings, the ALJ concluded that Mr. Plier did not have a disability as defined in the Act, from January 20, 2016 through December 31, 2019. R. 33–34. Mr. Plier now challenges that decision.

## III. Factual Record

The medical records included in the transcript begin before the alleged onset date. However, the period relevant to the Commissioner's disability determination is January 20, 2016 through December 31, 2019.

Mr. Plier's general practitioner, Dr. Michael Swearingen, referred him to Heart South Cardiovascular Group. *See* R. 601. Mr. Plier presented to cardiologist Jeff Segrest at Heart South Cardiovascular Group on June 12, 2015 for "uncontrolled hypertension." R. 499. Mr. Plier reported that he has "[n]o chest pain," but "experiences occasional dizziness, dyspnea on exertion[,] and has bilateral edema in

his feet with the left one being worse." R. 499. Dr. Segrest noted that Mr. Plier was an "every day smoker" and was counseled to quit. R. 500. Dr. Segrest noted that Mr. Plier complained of: "lightheadedness/dizzy, shortness of breath with exertion, swelling of hands or feet;" "wheezing, shortness of breath, excessive snoring, chronic cough;" "numbness"; "anxiety"; and "abnormal bruising." R. 500. Mr. Plier underwent an ECG on June 12, 2015, which was "within normal limits." R. 497. Dr. Segest prescribed carvedilol for hypertension, recommended a low sodium diet, and recommended a follow-up appointment in one month. R. 502.

Mr. Plier underwent a stress test on June 15, 2015. R. 476. Dr. Goyal noted that Mr. Plier "had no chest pain during the stress phase and review of the EKG demonstrated no ischemic changes." R. 476. Additionally, the test demonstrated "normal perfusion." R. 476. Mr. Plier underwent a transthoracic echocardiogram on June 17, 2015. R. 477. The impressions as noted by Dr. Goyal were: "1. Normal biventricular systolic ejection fraction. 2. Trace aortic insufficiency. 3. No obvious intracardiac or pericardial masses or effusions seen." R. 477.

Mr. Plier followed up with Dr. Goyal at Heart South Cardiovascular Group on July 22, 2015. R. 509. Mr. Plier complained of "edema in both legs" which was "worse as the day goes on" and painful swelling in his left leg. R. 509. Dr. Goyal noted that Mr. Plier's hypertension was "doing much better, but still elevated," and

that he would be changing medication. R. 511. Dr. Goyal also noted that he may refer Mr. Plier to the vein clinic if his edema did not improve. R. 511.

Mr. Plier followed up with Dr. Clifton Vance at Heart South Cardiovascular Group on August 3, 2015, complaining of chest pain and continued dizzy spells. R. 517. An "[e]cho and stress were obtained and were within normal limits." R. 518. Dr. Vance added a mediation for hypertension and advised Mr. Plier to follow up in one month. R. 520.

A carotid exam was conducted on August 25, 2015 because of Mr. Plier's dizziness. R. 496. "No significant obstructive stenosis" was seen in either the right or left extracranial system. R. 496. Mr. Plier followed up with Dr. Goyal on August 26, 2015. R. 526. At that visit, he denied chest pain and reported that his dizziness was better. R. 526. Dr. Goyal changed Mr. Plier's hypertension medication, referred him to the vein clinic, and instructed Mr. Plier to follow up in six weeks. R. 528.

Mr. Plier followed up with Dr. David Fieno at Heart South Cardiovascular Group on September 15, 2015. R. 521. Mr. Plier reported "heavy restless feeling with discoloration around [his] ankles." R. 521. Mr. Plier denied "wearing stockings or elevating legs daily." R. 521. Dr. Fieno assessed Mr. Plier for venous insufficiency and stated that ablation may be an option. R. 524. Dr. Fieno noted that Mr. Plier "would like to try conservation therapy," and he recommended "elevation, salt restriction, leg exercises[,] and stockings with follow up." R. 524. Dr. Fierno

ordered a venous ultrasound and advised Mr. Plier to follow up in ninety days. R. 525. The venous ultrasound found that Mr. Plier's right and left "great saphenous vein is incompetent," the right and left "small saphenous vein is competent," the right and left "anterior accessory saphenous vein is absent," the right and left "posterior accessory saphenous vein is absent," the right and left "common femoral vein . . . was negative for DVT," and the "popliteal vein was negative for DVT." R. 535–36.

On September 30, 2015, Mr. Plier followed up with Dr. Goyal. R. 537. Dr. Goyal noted that Mr. Plier's hypertension was "[w]ell controlled with current therapy." R. 539. Dr. Goyal also noted that Mr. Plier was using compression stockings for venous insufficiency, but was still experiencing symptoms and would try elevation and follow up with Dr. Fieno for a likely ablation. R. 539. Dr. Goyal instructed Mr. Plier to follow up in six months. R. 540.

After an episode of syncope and severe cough, a December 9, 2015 chest x-ray showed a "cardiac silhouette . . . within normal limits," "stable mild hilar prominence," and "minimal right apical scarring." R. 480, 487–88.

Mr. Plier followed up with Dr. Fieno on January 12, 2016, "to evaluate compression therapy for the past 90 days." R. 559. The visit notes reflect that Mr. Plier "has had some improvement in his leg symptoms since his last visit[,] but [he] is interested in other treatment options that are available." R. 559. Dr. Fieno noted

that Mr. Plier's venous insufficiency had deteriorated and recommended ablation. R. 562.

Mr. Plier followed up with Dr. Goyal on March 16, 2016, and complained of high blood pressure, dizziness, and passing out spells. R. 601. Dr. Goyal diagnosed him with syncope and hypertension. R. 725. Dr. Goyal prescribed an event monitor, referred Mr. Plier to neurology, and increased his hypertension medication. R. 604. The event monitor demonstrated "normal sinus rhythm." R. 674.

Dr. Robert Storjohann completed a psychological evaluation on April 22, 2016, upon referral of the Social Security Administration. R. 606. During this evaluation, Mr. Plier "described experiencing brief periods of heightened anxiety, but no clear panic attacks" and "indicated that he has not had any psychiatric treatment." R. 607. Mr. Plier also reported disturbed sleep, "periods of low energy," fatigue, social withdrawal and isolation, irritability and frustration, and poor attention and concentration. R. 607. Dr. Storjohann estimated Mr. Plier's intellectual functioning to be "in the borderline range," and considered Mr. Plier's prognosis to be "poor given his reported health problems, his personality dysfunction, his specific phobia, and his apparent intellectual limitations." R. 609.

Mr. Plier saw Dr. Goyal on May 4, 2016. R. 716. Dr. Goyal reported that there were no new cardiac concerns other than high blood pressure, but diagnosed Mr. Plier with a cough and "tachycardia and wheezing." R. 716, 719. Dr. Goyal

recommended that Mr. Plier go to the emergency room. R. 719. Mr. Plier presented to the Emergency Department at the Coosa Valley Medical Center on May 4, 2016 complaining of chest congestion with "chest pain, [shortness of breath], slightly elevated d-dimer, tachycardia." R. 614, 620. A chest x-ray indicated that his lungs were clear with "[n]o acute chest disease." R. 616. Mr. Plier was discharged with instructions to take medication and follow up with his primary care physician. R. 626.

Mr. Plier presented to the Emergency Department at the Coosa Valley Medical Center on May 21, 2016 complaining of dyspnea for two hours. R. 634. A chest x-ray indicated that his lungs were clear with "[n]o acute chest disease." R. 650. Mr. Plier was discharged with instructions to follow up with his primary care physician. R. 635.

Mr. Plier followed up with Dr. Goyal on June 1, 2016, due to elevated blood pressure and swelling. R. 705. Dr. Goyal changed Mr. Plier's hypertension medications and directed him to follow up in eight weeks. R. 708. Dr. Goyal also completed a Physical Capacities Evaluation on June 1, 2016. R. 611. Dr. Goyal did not complete Sections I–VII of the report, regarding Mr. Plier's specific physical limitations. R. 611. Dr. Goyal did complete Section VII, wherein he opined that Mr. Plier would likely to be absent from work as a result of his impairments or treatment "[m]ore than four days per month." R. 611.

On September 14, 2016, Mr. Plier saw Dr. Swearingen to follow up on his anxiety and COPD. R. 741. Mr. Plier complained of episodes of shortness of breath. R. 741. Dr. Swearingen prescribed medications, including inhalers, and directed Mr. Plier to follow up in six months. R. 743.

Mr. Plier saw primary care physician Dr. Swearingen on April 13, 2017 for his six-month checkup for anxiety and depression medication. R. 677.

Mr. Plier followed up with Dr. Goyal on October 12, 2017. R. 680. The visit notes indicate that Mr. Plier's blood pressure was "doing much better with his current regime." R. 682. Mr. Plier reported the following symptoms: fatigue; seasonal allergies; dizziness; passing out; chronic cough; wheezing; heartburn; anxiety; and easy bruising. R. 682. Dr. Goyal increased Mr. Plier's hypertension medication and ordered an EKG. R. 685.Mr. Plier's EKG results were within normal limits. R. 680. Dr. Goyal instructed Mr. Plier to follow up in twelve months. R. 685.

Mr. Plier saw Dr. Swearingen on December 14, 2017 to follow up on medication for anxiety and tremor. R. 808. Mr. Plier reported that while his blood pressure was doing better, his Prozac was not working as long as it had been working before. R. 808. Dr. Swearingen directed Mr. Plier to follow up in six months. R. 810.

Mr. Plier saw Dr. Ivan Slavich at Advanced Cardiovascular Care on January 4, 2018 for a disability determination. R. 746–47. Mr. Plier reported that he had "several syncopal episodes," dizziness, tremors, and anxiety. R. 746. Dr. Slavich

concluded that "[b]ased on [his] medical findings objectively, [Mr. Plier] doesn't have significant impairments that would preclude him from doing work related activities." R. 747.

Mr. Plier presented to the Coosa Valley Medical Center Emergency Department on March 10, 2018 complaining of syncope. R. 758. Mr. Plier stated that he was cooking when he had a coughing spell and a syncopal episode and fell and hit his head. R. 758. The emergency room doctor, ordered an EKG, CT of the brain, and chest x-ray, which showed "[n]o acute . . . abnormality" and "[n]o acute chest disease[,]" and discharged Mr. Plier. R. 760, 767, 772–73.

Mr. Plier presented to Dr. Swearingen on August 7, 2018 to follow up on his medication. R. 811. Dr. Swearingen prescribed medications and directed Mr. Plier to return in six months. R. 813.

Mr. Plier presented to Dr. Goyal on November 13, 2018 for a follow-up visit. R. 840. Dr. Goyal noted that Mr. Plier was "doing well from a [cardiovascular standpoint]. [Blood pressure] has been doing good for the most part – will have occasional spikes. No palpitations. No orthopnea, PND, palpitations or syncope." R. 840. Dr. Goyal ordered an EKG of Mr. Plier on November 13, 2018. R. 838. The EKG showed sinus tachycardia "within normal limits." R. 838. Dr. Goyal advised Mr. Plier to follow up in twelve months. R. 843.

Mr. Plier returned to Dr. Swearingen on March 18, 2019 to follow up on his anxiety medication. R. 814. He reported that he was "doing well with blood pressure." R. 814. Dr. Swearingen prescribed medications and directed Mr. Plier to return in six months. R. 815.

On June 3, 2019 Mr. Plier presented to Dr. Fieno complaining of "tiredness and heaviness, swelling, aching and throbbing [in his] bilateral legs." R. 833. Dr. Fieno completed a bilateral lower extremity venous ultrasound with Doppler interrogation. R. 845. It showed "no evidence of acute deep vein thrombosis in the lower extremities bilaterally," but "[s]ustained superficial venous valvular incompetency in the left greater saphenous vein in its entirety." R. 845. On July 9, 2019, Mr. Plier underwent an endovenous radio frequency ablation of both the right and left great saphenous veins. R. 831. A venous ultrasound follow-up report dated July 16, 2019 showed "no evidence of acute deep vein thrombosis in the lower extremities bilaterally," and "Bilateral GSV's are ablated = / > 2 cm distal to their SFJ's." R. 847.

Mr. Plier underwent a lower extremity PVR with stress report on September 10, 2019. R. 848. It showed that "[i]n the bilateral lower extremities the PVR waveforms are pulsatile to the level of the metatarsals. The ankle brachial index is normal bilaterally. There is no evidence of significant arterial occlusive disease at rest." R. 848.

Mr. Plier returned to Dr. Swearingen on September 16, 2019 to follow up on medication for tremor and nerves. R. 816. He reported that he was "doing better with his blood pressure." R. 816. Dr. Swearingen prescribed medications and directed Mr. Plier to return in six months. R. 818.

Mr. Plier presented to Dr. Fieno for "pain and tingling in his right leg" and underwent a venous ultrasound on October 28, 2019. R. 819–20. Dr. Fieno noted that Mr. Plier's venous insufficiency and leg pain were improved and his venous stasis dermatitis and body mass index were unchanged. R. 823. A venous ultrasound with Doppler interrogation was performed. R. 850. It concluded "R distal GSV is still patent and refluxing over 500ms." R. 850. On that same day, Mr. Plier presented to Dr. Goyal for an eleven-month follow-up. R. 825. Dr. Goyal noted that Mr. Plier was "[d]oing well" from a cardiovascular standpoint; his blood pressure has "finally come down"; and there was "[n]o orthopnea, PND, palpitations[,] or syncope." R. 825. To treat Mr. Plier's hypertension and non-sustained ventricular tachycardia, Dr. Goyal continued medications, advised a follow up in twelve months, and counseled Mr. Plier on exercise, smoking cessation, and appropriate diet. R. 828. Dr. Goyal also ordered an EKG, which was "within normal limits." R. 830.

On November 4, 2019, Dr. Fieno completed an "[u]ltrasound guided sclerotherapy of the right distal great saphenous vein." R. 853.

## IV.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the

reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## V.   Discussion

Mr. Plier alleges that the ALJ's decision should be reversed and remanded because the ALJ: "failed to respond to the order of the Appeals Council requiring consideration of the opinion evidence of [Mr. Plier's] treating cardiologist"; "erred in holding that [Mr. Plier's] daily activities diminish the persuasiveness of his allegations"; and "improperly drew Adverse Inferences from Lack of Medical Treatment." Doc. 11 at 2.

### A. The ALJ's Evaluation of Dr. Munish Goyal's Medical Opinion

Mr. Plier first argues that the ALJ erred by "fail[ing] to respond to the order of the Appeals Council requiring consideration of the opinion evidence of [Mr. Plier's] treating cardiologist, Dr. Munish Goyal." *Id.* at 24. Mr. Plier argues that the ALJ failed to address Dr. Goyal's opinion evidence. *Id.* at 25.

Under the regulations applicable to Mr. Plier's application for benefits, the ALJ must articulate the weight given to different medical opinions in the record and the reasons therefore. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). The weight afforded to a medical opinion regarding the nature and

severity of a claimant's impairments depends upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, whether the opinion is consistent with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. § 404.1527(c).

The regulations and case law establish a general preference for assigning greater weight to the opinions of treating medical sources than the opinions of non-treating medical sources, and greater weight to the opinions of non-treating medical sources than the opinions of non-examining medical sources. *See* 20 C.F.R. §§ 404.1527(c)(1)-(2); *Ryan v. Heckler*, 762 F.2d 939, 942 (11th Cir. 1985). Thus, a treating physician's opinion is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).

"Good cause" exists for an ALJ to not give a treating physician's opinion substantial weight when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citing *Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)

(holding that "good cause" existed where the opinion was contradicted by other notations in the physician's own record). On the other hand, the opinions of a one-time examiner or of a non-examining medical source are not entitled to the initial deference afforded to a physician who has an ongoing treating relationship with a plaintiff. *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987).

An ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *McCloud v. Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)). Further, an ALJ does not err when it declines to give a medical opinion controlling weight, if the ALJ articulates specific and proper reasons for doing so. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005); *see also Beegle v. Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012).

Additionally, applicable regulations provide that physicians' opinions on issues such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d). The court focuses on the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her]

condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician may be relevant to the ALJ's findings, but they may not be determinative, because the ALJ bears the responsibility for assessing a claimant's residual functional capacity. *See, e.g.,* 20 C.F.R. § 404.1546(c).

Mr. Plier argues that the ALJ failed to accord proper weight to a June 1, 2016, opinion—a Physical Capacities Evaluation—by his treating cardiologist, Dr. Goyal. Doc. 11 at 25. In the Physical Capacities Evaluation, Dr. Goyal completed Section VIII, where he opined that Mr. Plier would miss more than four days of work per month *Id.*; R. 611. Dr. Goyal did not complete sections I–VII of the Physical Capacities Evaluation, which inquired about Mr. Plier's ability to sit, stand, walk, lift, carry, use his hands and feet, stoop, crouch, kneel, crawl, climb, balance, reach, and work around certain hazards. R. 611.

On remand, the ALJ considered and discussed in her decision Dr. Goyal's medical opinion. R. 16, 28. First, the ALJ stated her understanding that the Appeals Council "directed [her] . . . to further consider the opinion of treating source Munish K. Goyal, M.D." R. 16. Second, the ALJ rejected the conclusory opinion of Dr. Goyal. The ALJ explained her consideration of Dr. Goyal's opinion:

> On June 1, 2016, Dr. Goyal opined [Mr. Plier] would miss more than four days of work per month. He gave no other exertional or non-exertional limitations. He did not provide a basis or explanation of what would warrant such excessive absences. This is wholly inconsistent with his treatment notes at the time of the opinion and currently.

> Dr. Goyal consistently notes [Mr. Plier] was (and is currently) doing well on his hypertension medications. His blood pressure slowly improved over the years, and his most recent treatment notes document it is well-controlled. A review of Dr. Goyal's treatment notes shows that they do not document any disabling limitations that would warrant such excessive absences. Arrhythmia monitoring showed tachycardia, but [Mr. Plier] was asymptomatic. He was having some syncope, but not at the rate that would warrant four or more absences in a month. He recently denied syncope, so this has resolved. [Mr. Plier] is doing much better. His blood pressure is controlled on his current treatment regime.

R. 28 (citations omitted). The ALJ "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527." R. 23.

Mr. Plier argues that "[t]he ALJ failed to address the opinion evidence of" Dr. Goyal, "failed to respond to the order of the Appeals Council in a meaningful manner," and "disregarded the opinion of a treating physician without stating good cause." Doc. 11 at 25; Doc. 13 at 4.

The ALJ properly discounted Dr. Goyal's opinion in the Physical Capacities Evaluation because it was conclusory and unexplained. R. 28, 611. Additionally, Dr. Goyal's conclusion was inconsistent with his own treatment record, which the ALJ discussed. R. 28, 476–77, 509–11, 526–28, 537–40, 601, 604, 674, 682, 685, 705–08, 716, 719, 725, 840–43. Additionally, other evidence from the record supports a conclusion contrary to Dr. Goyal's opinion. *See* discussion *supra* Part II.

Because Dr. Goyal's opinion was conclusory and unexplained and not supported by his own treatment or Mr. Plier or the record as a whole, the ALJ could properly reject his opinion. Additionally, the ALJ stated the reasons why she discounted the opinion, thus satisfying the "good cause" requirement. R. 28. Substantial evidence supports the ALJ's decision.

## B. The ALJ's Evaluation of Daily Activities

Mr. Plier next argues that the ALJ erred in holding that his daily activities diminish the persuasiveness of his allegations. Doc. 11 at 25.

A claimant's subjective complaints are insufficient to establish a disability. *See* 20 C.F.R. § 404.1529(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a claimant claims disability due to pain or other subjective symptoms. The claimant must show evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 404.1529(a), (b); Social Security Ruling 16-3p, 2017

WL 5180304, at *3-*4 (Oct. 25, 2017) ("SSR 16-3p"); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of a claimant's alleged symptoms and their effect on his ability to work. *See* 20 C.F.R. § 404.1529(c); *Wilson*, 284 F.3d at 1225-26. In evaluating the extent to which a claimant's symptoms affect his capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a claimant's symptoms, (3) the claimant's daily activities, (4) precipitating and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the claimant takes to relieve symptoms, and (8) any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. § 404.1529(c)(3), (4); SSR 16-3p at *4, *7-*8. To discredit a claimant's statements, the ALJ must clearly "articulate explicit and adequate reasons." *See Dyer*, 395 F.3d at 1210.

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.*

24

A credibility determination is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014); *see Hand v. Heckler*, 761 F.2d 1545, 1548-49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom., Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). However, a reversal is warranted if the decision contains no indication of the proper application of the pain standard. *See Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D.F.L. 1996) (holding that the ALJ's failure to articulate adequate reasons for only partially crediting the plaintiff's complaints of pain resulted in reversal). "The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Mr. Plier argues that the ALJ erred when she found that his "activities of daily living further diminish the persuasiveness of his allegations." Doc. 11 at 26; R. 28.

After delineating the pain standard, the ALJ noted that the regulations include "daily activities" as a factor relevant to the claimant's symptoms. R. 23. When describing Mr. Plier's symptoms, the ALJ wrote:

> [Mr. Plier] alleges an inability to work due to leg pain, high blood pressure, and dizziness. He alleges these restrict his ability to stand (one hour), walk (100 yards), and sit (45–60 minutes). He alleges his legs get heavy when he walks. He also alleges anxiety. He alleges he gets nervous in vehicles. He alleges numbness, tingling, and

> swelling in his legs. He alleges he bandages his legs and
> feet and props his legs up three to four hours a day to keep
> the swelling down. He alleges he passes out due to
> dizziness. He alleges breathing difficulty. He alleges he
> cannot catch his breath. He alleges when it is hot outside,
> he has difficulty breathing. He alleges he is unable to get
> off the couch about 3–4 days a month.

R. 23–24. Along with her consideration of the record medical evidence, function

reports, and hearing testimony, the ALJ considered Mr. Plier's daily activities when

making her credibility determination. R. 28. The ALJ described her assessment of

Mr. Plier's daily activities as follows:

> The undersigned also finds that [Mr. Plier's] activities of
> daily living further diminish the persuasiveness of his
> allegations. [Mr. Plier] reported that he is able to manage
> his personal care, mow the grass, do household repairs,
> ride in a car, leave home, manage his finances, spend time
> with family and friends, and watch television. At the
> psychological consultative examination, [Mr. Plier]
> reported that he is able to occasionally prepare simple
> meals, do yard work, watch television, and listen to music.
> Although the claimant reported that he does not cook,
> emergency department record indicates that he reported
> passing out while he was cooking. These activities of daily
> living are consistent with the ability to perform light work
> and are directly contradictory to [Mr. Plier's] allegation
> that he is unable to work in any capacity.

R. 28 (citations omitted).

The controlling regulations specifically list daily activities as a factor to

consider in evaluating a claimant's credibility regarding his symptoms. 20 CFR §

404.1529(c)(3)(i). Additionally, an ALJ is entitled to consider a claimant's daily

activities at Step Four, as she did here. *See Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987).

The ALJ's finding that Mr. Plier's daily activities were inconsistent with his allegations of total disability is supported by substantial evidence. As the ALJ noted, both the medical evidence and the function reports indicate a level of activity that reasonably supports the ALJ's residual functional capacity of light work with further restrictions. R. 362–65, 608, 758. Additionally, the ALJ did not solely rely on daily activities in her credibility determination; rather the discussion of daily activities was one paragraph of a ten-page, thorough analysis under binding precedent and regulations. R. 22–31. With respect to her credibility determination, the ALJ concluded that "[a]fter assessing [Mr. Plier's] subjective allegations in light of the regulatory factors, as well as the medical evidence, relevant opinions, if any, and Function Reports, if any, and hearing testimony, the undersigned finds that [Mr. Plier's] impairments would reasonably limit him to light work as heavy lifting and carrying may exacerbate his pain, cardiovascular issue, and breathing issues." R. 30–31. She continued by listing the further restrictions she imposed in her residual functional capacity. R. 31. Substantial evidence supports the ALJ's credibility determination, including her discussion of Mr. Plier's daily activities.

### C. The ALJ's Inference from Lack of Medical Treatment

Mr. Plier next argues that the ALJ "drew adverse inferences from the lack of medical evidence which resulted in an adverse decision." Doc. 11 at 28.

The evaluation of symptoms under the pain standard discussed above prohibits an ALJ from drawing adverse inferences about a claimant's failure to seek medical treatment without first considering a claimant's explanation. "[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Social Security Ruling 96-7p, 1996 WL 374186, at *7 (July 2, 1996). However, "[a] conservative treatment plan tends to negate a claim of disability." *Morales v. Comm'r*, 799 F. App'x 672, 676 (11th Cir. 2020) (citing *Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996)). Additionally, the burden is on the claimant to introduce evidence in support of her application for benefits. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

Mr. Plier alleges that the ALJ "failed to develop the record on the issue of lack of medical treatment" and committed error by "draw[ing] an inference from lack of treatment due to no income." Doc. 11 at 31; Doc. 13 at 10.

The ALJ discussed Mr. Plier's mental health treatment in her determination of residual functional capacity, specifically with respect to her analysis of Mr. Plier's

psychological consultative exam. R. 29. The ALJ stated that "[t]here is no evidence of mental health treatment other than prescribed medications by his primary care physician." R. 29. There is no evidence of noncompliance with a proscribed treatment regimen, nor is there evidence that Mr. Plier's inability to afford treatment prevented him from further medical treatment. Instead, the record shows that Mr. Plier received medications for his mental health that were prescribed by his primary care physician, Dr. Swearingen, who treated Mr. Plier every six months. R. 677, 741–43, 808–17. The ALJ did not err by noting Mr. Plier's conservative treatment in her assessment of Mr. Plier's psychological consultative examination.

## VI.    Conclusion

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 23rd day of March, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE